**Antonio JAMES, Petitioner–Appellant,**

v.

**John P. WHITLEY, Warden, Louisiana State Penitentiary, Respondent–Appellee.**

No. 89–3672.

United States Court of Appeals, Fifth Circuit.

March 12, 1991.

William J. O'Hara, III, Lemann, O'Hara & Miles, Nicholas Joseph Trenticosta, New Orleans, La., for petitioner-appellant.

Jack Peebles, Asst. Atty. Gen., William J. Gusre, Jr., Atty. Gen., New Orleans, La., for respondent-appellee.

Before CLARK, Chief Judge, KING and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Petitioner-appellant Antonio James (James) appeals the district court's denial, following an evidentiary hearing, of his third federal habeas petition challenging his December 1981 Louisiana first degree murder conviction and death sentence for the January 1, 1979 killing of Henry Silver. We affirm.

## Procedural History

James was charged in a July 12, 1979 indictment with the first degree murder, on January 1, 1979, in Orleans Parish, Louisiana, of Henry Silver, contrary to LSA–R.S. 14:30. Following a jury trial in the Orleans Parish district court on December 14, 15, and 16, 1981, he was found guilty as charged. The jury, on December 17, 1981, at the conclusion of the bifurcated trial's

sentencing proceeding, recommended that James be sentenced to death. On direct appeal, the Louisiana Supreme Court affirmed James' conviction and sentence, and the United States Supreme Court denied his petition for writ of *certiorari*. *State v. James*, 431 So.2d 399 (La.), *cert. denied*, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983).

Thereafter, having unsuccessfully sought state post-conviction relief, in November 1983, James filed a petition for habeas relief in the court below under 28 U.S.C. § 2254 and, in June 1984, the district court dismissed that petition without prejudice for failure to exhaust state remedies. James then again sought post-conviction relief in the Louisiana state courts and, such relief being denied, in late July 1984, he again filed a section 2254 petition in the court below. The district court granted a stay of execution and set an evidentiary hearing, which was held on October 4 and 5, 1984, after James had filed an amended petition. On October 17, 1985, the district court issued a lengthy opinion rejecting each of James' claims, dismissing his petition with prejudice, and vacating the previously entered stay. James timely filed a motion for new trial and requested a stay of execution. Following a November 26, 1985 nonevidentiary hearing on these matters, the district court granted a stay of execution and took the motion for new trial under advisement. On September 17, 1986, the district court issued a memorandum opinion and order denying the motion for new trial and vacating the stay of execution. James filed notice of appeal to this Court, and applied to this Court for a certificate of probable cause and a stay of execution pending appeal. After full briefing, we denied the application for certificate of probable cause, and vacated the interim stay of execution we had previously entered. *James v. Butler*, 827 F.2d 1006 (5th Cir.1987), *reh'g en banc denied*, 831 F.2d 1062, *cert. denied*, 486 U.S. 1046, 108 S.Ct. 2044, 100 L.Ed.2d 628 (1988). James then brought a series of state court attacks on his December 1981 conviction and sentence, all of which were ultimately denied by the Louisiana Supreme Court, without

opinion, in orders dated December 9, 1988, January 30, 1989, and February 9, 1989.

On February 10, 1989, James brought this his third section 2254 attack on his December 1981 conviction and sentence. The district court granted a stay of execution, and on May 11, 1989, held an evidentiary hearing on James' claim that the state withheld exculpatory evidence. On September 19, 1989, the court issued its opinion denying each of James' several claims, and dismissed his petition. Subsequently, the district court granted a certificate of probable cause and stay of execution. Throughout all the present and prior state and federal proceedings, James has been represented by counsel.

Having heard oral argument and reviewed the briefs and record, we now affirm.

On appeal, James asserts the district court erred in denying him relief on the following two claims:

(1) that the state violated his rights under the United States Constitution by withholding two specific items of asserted exculpatory evidence, namely (a) a January 1, 1979, New Orleans Police Department district office report by Officer Pupero describing statements by Ms. Thomasine Miller, a neighbor who allegedly observed the scene of the crime near the time it occurred and whose existence was unknown to the defense, and (b) a June 27, 1979 police "daily" report by New Orleans Police Department homicide detective Venezia describing statements made to him in a June 25, 1979 interview by Levon Price, who was present with James when the offense was committed and testified for the state at the December 1981 trial; and,

(2) that the jury was led to believe, by or principally by the sentencing verdict form, that all twelve jurors had to unanimously agree on a finding of mitigation before they could return a life sentence instead of a sentence to death, contrary to *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).[1]

## Discussion

### I.  *Withheld Exculpatory Evidence*

#### A.  *Report of Price statement*

■  James contends that the "daily" report of Detective Venezia respecting what Price said to Venezia in a June 25, 1979 interview was not disclosed to the defense before or during the December 1981 trial and reflected statements by Price that were inconsistent with his trial testimony.[2] The district court's opinion did not address this claim.[3]

---

**1.**  While James raised several other claims below, on this appeal he does not complain of the district court's rulings denying relief on any of these claims—generally on the basis of abuse of the writ under Rule 9(b) of the rules following § 2254—and consequently all of such claims other than the two stated in the text above are deemed abandoned. *See, e.g., Hobbs v. Blackburn,* 752 F.2d 1079, 1083 (5th Cir.1985); *Lucas v. Wainwright,* 604 F.2d 373, 374 (5th Cir.1979).

**2.**  Price testified at the December 1981 trial that on January 1, 1979, he drove James to and from the scene of the robbery and murder of Silver, but that he, Price, stayed in the car and that James was the perpetrator. The inconsistencies pointed to are that the report of the June 25, 1979 interview reflects that Price said he had earlier on the evening of January 1, 1979, come into contact with James about 10:00 p.m. and James gave him $3 to drive James to James' aunt's house, which he was doing when they came upon Silver, and that Price did not know whether James took anything from Silver in the incident, while at trial Price testified that he initially picked James up not long after Price

got off work at 7:30 p.m. on January 1, 1979, and was driving James to James' *sister's* house when they came upon Silver, without mentioning any payment for this by James, and that when James returned to Price's car James told Price he had taken $35 from Silver. James' tape-recorded statement to Detective Venezia, which was put in evidence at trial and which at the sentencing hearing James testified was correct, likewise states that James was with Price in Price's car between 10:00 and 11:00 p.m. January 1, 1979, when they came upon Silver, and James states that Price shot and robbed Silver of $35, of which he gave $15 to James. Other evidence showed, and it is not disputed, that Silver's murder and robbery occurred between 8:00 and 9:00 p.m. January 1.

**3.**  Neither James' petition nor the pretrial order raises this claim. The record reflects that James' attorneys claimed to have received the June 27, 1979 Venezia report "on or about March 23, 1989, in response to a subpoena *duces tecum*." Yet they never sought to amend the habeas petition or the pretrial order. The latter

James' claim in this respect is clearly without arguable merit. The only part of the June 27, 1979 report that has, or which James claims has, any arguable significance is that part of the report that purports to summarize what Price told Venezia when the latter interviewed Price and took a tape recorded statement from him on June 25, 1979. The report recites in this connection that "At 7:15 p.m., a tape recorded statement-conversation between Detective Venezia and Levon Price was begun.... Price rendered the following account of the murder of Henry Silvers [*sic*]." There then immediately follows two paragraphs summarizing what Price said. These two paragraphs contain *the only* statements in the report that James claims are material. Then, the report's very next two paragraphs thereafter state:

"At 7:28 p.m., the taped conversation was completed. It is presently being retained in Detective Venezia's personal locker for safekeeping.

"Upon completion of the statement, Detective Venezia completed the necessary arrest reports charging Price with murder and armed robbery. Price was then transported to Central Lock-up by Detective Venezia at 8:00 p.m., where he was formally charged."

While this written report was not delivered to the defense prior to trial, it is undisputed that the taped statement was. This is apparent throughout the record of the December 1981 trial, which was put in evidence at the May 11, 1989 hearing. Among other things, this record reflects that the following transpired in open court on consideration of motions just before trial began on December 15, 1981:

"BY MR. CHESTER (assistant district attorney):

"... Additionally, yesterday we learned that there was a taped statement which exists which is in the custody of Detective Martin Venezia of the New Orleans Police Department which is a statement given by Levon Price, who on June 25th, 1979, was arrested and charged with the crime of murder by the New Orleans Police Department. This is the same murder that Mr. James is on trial for today. Although the defense did not request this tape, the taped statement, on any of its discovery pleas, as far as I know, and even though the law does not require us to turn it over to Mr. Johnson and his client, out of an abundance of caution, we let Mr. Johnson listen to that tape and he was free to take notes, and, I believe, he expressed his satisfaction with that spontaneous discovery on our part.

"BY MR JOHNSON (defense counsel):

"The defense is satisfied with the district attorney's efforts to comply with the spirit as well as the letter of the law, your honor.

"BY THE COURT:

"All right."

---

expressly limited the issues for the May 11 hearing to "the failure to produce the information regarding Ms. Miller." Although the pretrial order was initially prepared March 7, 1989, it was not entered until April 27, 1989, when the pretrial conference was held, more than a month after the time James' counsel admittedly had the June 27, 1979 Venezia report. James did raise (though in a distinctly subordinate manner) the June 27, 1979 report in a "Post–Hearing Memorandum" submitted by James' counsel to the district court on May 25, 1989. By then, however, the evidentiary hearing had concluded. James argues that the issue was tried by consent under Fed.R.Civ.P. 15(b) because Venezia, the last witness to testify at the May 11 hearing, was cross-examined about it by James' counsel without objection. However, it is not at all clear that this cross-examination, which was conducted in the context of similar cross-examination concerning Venezia's June 25, 1979 "daily" summarizing James' June 22, 1979 tape-recorded statement to Venezia, was not (or not also) for another purpose, namely to show that both Price and James had been wrong on various matters, so that controlling importance should not be given other matters in James' statement that tended to undercut the significance that James claimed for Ms. Miller's observations. Where unobjected to evidence is relevant to an issue covered by the pleadings it normally may not be the basis for a determination of trial by consent of another issue not covered by the pleadings. *See Trinity Carton Co. v. Falstaff Brewing Corp.*, 767 F.2d 184, 193 (5th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986). For the reasons subsequently stated in the text, we need not resolve whether the claim respecting Venezia's June 27, 1979 report has been waived.

Mr. Johnson, counsel for James at the December 1981 trial, was present and testified at the May 11, 1989 hearing, and admitted that he was furnished Price's taped statement. He never testified that there was anything in the June 27, 1979 report of Price's statements to Venezia that was not on the tape he was furnished (nor even that he could not remember or was unsure of this). Venezia was asked at the May 11 hearing whether he was ever requested to produce the June 25 and 27, 1979 daily reports to defense counsel and he responded, "No, sir, only the tape recordings of these statements." There is absolutely no evidence that the July 27, 1979 report's recitation concerning Price's statements to Venezia contains any statement by Price not contained on the tape that the report purports to summarize and that was furnished defense counsel prior to the December 1981 trial. Accordingly, there is no evidence that the state failed to provide or withheld anything exculpatory (or potentially impeaching of its witness Price) from the defense in this connection. The habeas petitioner carries the burden of showing that the prosecution has withheld material evidence, and clearly no such showing has been made as to these statements of Price.

## B. *Report respecting Ms. Miller*

Because the defense was not furnished information concerning Ms. Miller, whose observations of the scene of the crime at what may well have been close to the time of its occurrence were known to the district police officer, a somewhat fuller treatment of this issue is in order.

The district court, after considering the evidence at the May 11 hearing, including the testimony of Ms. Miller, and the state trial record, denied relief, applying the test laid down in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), and determining "it is not reasonable to conclude that the testimony of Thomasina Miller, if given at trial, would probably have resulted in a different trial outcome" and that the absence of Ms. Miller's "evidence was not sufficient to undermine confidence in the outcome of the proceedings." The court found it "clear that

Ms. Miller saw two passersby," not Price and James as petitioner would infer. On appeal, James contends that *Bagley* is not the appropriate standard to apply, but that even if it were the district court clearly erred. We disagree.

■ (1) *Bagley.* James argues that the *Bagley* standard should not be applied because this is a capital case, while *Bagley* was not. It is alternatively argued that *Bagley* should in any event not be applied in determining whether the accused is entitled to relief respecting a capital sentence where the undisclosed evidence is favorable to him in respect to sentencing. We reject these contentions. The standard articulated in *Bagley* was expressly borrowed from that of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which applied that standard to a challenge to a capital sentence. *See Bagley*, 105 S.Ct. at 3383; *Strickland*, 104 S.Ct. at 2056, 2071. Moreover, we have applied *Bagley* to capital sentencing challenges. *See, e.g., Smith v. Black*, 904 F.2d 950, 964–68 (5th Cir.1990). We likewise reject James' attempt to avoid *Bagley* by arguing that the failure to disclose the existence of Ms. Miller and her observations in effect limited his Sixth Amendment rights to compulsory process, cross-examination, confrontation, and the effective assistance of counsel. That is no more so in this case than in almost any *Bagley* setting, and *Bagley* itself rejected analogous arguments concerning confrontation and cross-examination. *Id.*, 105 S.Ct. at 3380–3381.

We note in this connection that there is no claim here of bad faith on the part of the state. It was stipulated in the pretrial order (and nothing in the record suggests otherwise) that neither of the state prosecutors knew of Ms. Miller or the district office police report recounting her observations. This report was prepared on the night of Silver's murder by Officer Pupero, of the police local district office, and he came to the scene of the crime not long after it occurred and at that time he "took Ms. Miller's statement." Neither of the assistant district attorneys handling the tri-

al, nor Detective Venezia, who was the homicide officer in charge of the case (and was not a district officer), was aware of the existence of Pupero's report.[4] Ms. Miller testified at the May 11 hearing that after talking to the police on January 1, 1979, she was never contacted by the police or anyone from the district attorney's office or the indigent defender office (which represented James).

The January 1, 1979 report described Ms. Miller as "Ms. McElreen"—apparently because she was then living with Dennie McIllwane, whom the report referred to as Denney McElreen—and reflects that on that date she "stated that about 8:30 p.m. she heard some people talking in front of her residence, looked out of her window and observed two unidentified males, one with a plaid jacket on, talking, but did not hear or see anything unusual after that." An earlier part of the report recounts the finding of Silver's body at 2631 Dauphine Street by Dennis McElreen (McIllwane) who it states

> "told officers that at about 8:45 p.m., an unknown negro male (5'10", 150 lbs. dark complexion with a short bush, wearing dark clothing) knocked at his front door and stated that there was an old man bleeding on the sidewalk in front of his house.... [H]e then opened the door, observed the victim on the ground, but could not locate the subject that knocked

on his door ... he then phoned the police ... prior to finding the victim, he did not see or hear anything unusual."

The report also recounts that Mrs. Alegria of 2625 Dauphine Street reported that "at about 8:30 p.m." she "heard what sounded like someone screaming for help, and shortly after what sounded like a gun shot," and she and her husband "looked out of their front window, but did not see anyone." The report likewise reflects that the police were called at 8:42 p.m. and the "Date–Time Handled" blank on the report is filled in "01–01–79 8:44 p.m." [5]

In connection with the December 1981 trial, there was no specific discovery request for police reports or the like. The defense discovery motion did include as item 13 "Are there any witnesses to the alleged offense; if so, please state their names, addresses and phone numbers." [6] We do not consider that Ms. Miller can be deemed to fall within this request. The report does not suggest that Ms. Miller was a witness to the crime,[7] and her testimony at the May 11 hearing clearly reflects that she was not, and further reflects that she could not then (or previously) identify either of the two men she saw.[8] The only other possibly relevant item in the defense discovery request was item 16, which asked "Is the state in possession of any evidence or statement which would tend to exculpate the defendant? If so,

---

4. The pretrial order states that it was uncontested that Ms. Miller "made statements to a district officer on the night of Mr. Silver's death" and "District Officer George Pupero took Ms. Miller's statement."

5. James has not raised, here or below, any claim concerning Denney McIllwane or the Alegrias, or anything in this report other than, as specified in the pretrial order, "the information regarding Ms. Miller." Neither McIllwane nor either of the Alegrias nor Officer Pupero (who it was stipulated "does not remember anything about the crime or his investigation") testified at the May 11, 1979 hearing (or at the December 1981 trial).

6. The prosecution did not respond to this, claiming the identity of its witness was not discoverable.

7. When she was questioned at the May 11 hearing as to whether what the report attributed to her was "the substance of the statement that you

gave to the police," Ms. Miller stated "I think I went into a little more detail when I talked to them," but did not otherwise specify what additional she told the police.

8. She did indicate they were young black men, who were neither particularly large nor particularly small, but could not be more precise. She did not see their faces (or their hands or whether either held any object). She was unclear whether she actually heard them talking. She did say one man wore a red plaid jacket and one (which may or may not have been that man) wore a "putty" or "khaki" colored knit cap; she did- not recall that either wore a blue jacket. The undisputed evidence is that when Silver was killed both James and Price wore "solid blue" jackets and James wore a "red and blue" knit cap. Both James and Price are black; James was born October 30, 1954; Price, October 10, 1953.

what is the nature of the evidence, and by whom was it provided to the State?" Detective Venezia testified at the May 11, 1989 hearing that he had interviewed Ms. Miller earlier that year, that he did not consider that she was "a witness to anything germaine to this case" or that what she said was "of significance."

Clearly, this is not a case of either police or prosecutorial bad faith. We also observe that neither the police nor the prosecutors in any way concealed or hid Ms. Miller's existence from the defense. The defense clearly knew of the place, and the approximate time, of Silver's shooting, but never attempted to speak to any of those residing along that portion of Dauphine Street. At the May 11 hearing, defense counsel explained this by saying he was simply too busy.

We apply the statement in *Bagley* that the test there approved is

> "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused. The evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* 103 S.Ct. at 3383.

*See also id.* at 3385 (concurring opinion) (same).[9] Justice Blackmun in *Bagley* does go on to indicate that in the application of this test to a specific case, it may be proper to weigh in favor of the accused "the more specifically the defense requests certain ev-

idence, thus putting the prosecutor on notice of its value." *Id.* at 3384.[10] Within the framework of this passage from Justice Blackmun's *Bagley* opinion, we consider that this is not a specific request case, nor is it a case in which any request made by the defense could reasonably be considered as "putting the prosecutor on notice of ... [the] value" of Ms. Miller.

We turn now to the application of *Bagley* to the particular facts of this case.

■ (2) *Application to this case.* The police apparently had no suspects in the January 1, 1979 Silver murder until, following James' May 1979 conviction for the January 26, 1979 New Orleans armed robbery of Robert Hooten, James on June 22, 1979, while awaiting sentencing for that offense, "sent word to the District Attorney's office that he had information on several other armed robberies and two murders, which he was willing to talk about." [11] He was interviewed that day by the police Robbery Unit, to whom he related "several" armed robberies and two murders in which he had been involved. One of the murders was that of Alvin Adams in New Orleans on January 23, 1979.[12] The other was the Silver murder, which was being investigated by homicide detective Venezia. Later on June 22, 1979, Venezia took a statement from James concerning the Silver murder. In this statement, which was played in full at James' December 1981 trial, James related that he and a man he knew only as "Smokey"—later identified as Levon Price—were in the latter's car, Smokey driving, between 10:00 and 11:00 p.m. January 1, proceeding down Dauphine Street, and observed a man—Sil-

---

9. We assume, *arguendo,* that Ms. Miller's evidence can be characterized as "favorable to the accused."

10. But see *id.* 103 S.Ct. at 3385 (concurring opinion) ("no reason to attempt to elaborate on the relevance to the inquiry of the specificity of the defense request for disclosure").

11. James was ultimately sentenced to ninety-nine years' imprisonment for the Hooten armed robbery, and his conviction and sentence were affirmed by the Louisiana Supreme Court. *State v. James,* 395 So.2d 1368 (La.1981) (table).

During the January 26, 1979 Hooten robbery, Hooten took away from James the .22 caliber revolver James had employed, and shot James with it. James fled, but was arrested at the hospital later that evening, Hooten having reported the robbery and turned the pistol over to the police.

12. James was convicted of the first degree murder of Alvin Adams and on October 30, 1981, was sentenced to life imprisonment for that offense. His conviction and sentence were affirmed by the Louisiana Supreme Court. *State v. James,* 422 So.2d 1164 (La.1982) (table).

ver, as it turned out—parking his four-door car on the left side of Dauphine, driver's side to the curb, about fifteen feet from the corner. Smokey stated "that look like a quick hustle right there" and turned left at the corner, parking there along the right side of the intersecting street. He and James exited the car and walked over toward Silver, who was about to get out of his car. James was aware that "hustle" meant rob and that Smokey had a .22 caliber revolver on his person. James said the revolver belonged to Edgar Taylor, but that Smokey, Taylor, and James would "take turns in robbing and borrow" the gun from each other or "swap" it "back and forth." Smokey approached the man with the gun drawn as the man was getting out of his car. The man was "hollering 'help,'" "shouting out 'help, help' . . . real, real loud." Smokey came to the rear end of the driver's door, and as Silver was getting out of his car with his umbrella in hand "he kind of like shoved the umbrella towards Smokey. And Smokey backed up. And the man got out of the car." James said it then "looked like he tried to run but, you know, we was too close upon him for him to run." However:

> "when he got to the end of the car, Smokey cocked the pistol back and went to him and put the gun by his neck and told him to give it up. The man was in shock like, but he was still hollering. He had done dropped the umbrella and everything. And Smokey just shot him."

The man fell to the sidewalk beside his car, Smokey took his wallet from his back pocket, "and he told me to come on and we just started running. And we got in the car and we left."

Later Smokey opened the wallet, which had only $35 (a $20 bill, a $10 bill, and a $5 bill), and gave James $15 of it, keeping the wallet and the gun. James advised that the New Orleans Police Department now had the gun, having gotten it January 26,

1979. He further stated that when Smokey put the gun on the man, he put it right below his right ear.

James described Silver as elderly, wearing a suit and glasses. He said that when he and Smokey fled, the driver's door on Silver's car was still open, the car's lights and windshield wipers still on, and the key was in the ignition. He assumed Silver was dead.

James further stated that Smokey had on his service station work clothes and a "solid blue" jacket. James said "I was dressed in green pants and a blue jacket and a red and blue colored knit hat." He also said his jacket was "solid blue." [13]

After James' statement was taken, Price was arrested and gave a taped statement to Venezia on January 25 as above related. Price's version (as reflected in Venezia's summary thereof in his June 27 report) was that he was driving his car with James (whom he had picked up about 10:00 p.m.) as a passenger, and as they were on Dauphine Street going to James' aunt's, James ordered Price to stop. James exited the vehicle and "approached an elderly white, who was just parking his vehicle against the curbing." Price drove to the intersection, parked in the intersecting street at the corner, and from his car "observed James approach the elderly white man, who began yelling for help; this was followed by the sound of a gunshot. The white man fell to the ground immediately after the gunshot and James ran from the victim into Price's vehicle. Both parties then fled the area."

Following Price's statement, ballistics tests were run on the pistol recovered in James' January 26 robbery of Hooten, and these showed that that weapon was the one which fired the bullet that killed Silver as well as that which killed Adams. Price pleaded guilty to a charge of accessory

---

13. When asked why he was making the statement, James said because "Smokey and Edgar" had "threatened my—my girlfriend" and "told her if I would tell on them that they would, you know, hurt her"; he did not explain why this caused him to implicate Smokey. In a suppression hearing in connection with the December 1981 trial James testified that he gave the statement because officers promised him leniency in respect to the January 26 robbery or a setting aside of that conviction if he cooperated. The officers denied this. The state judge found against James and denied the motion to suppress.

after the fact in the Silver murder, and received a probated five-year sentence.

At James' December 1979 trial the coroner testified that Silver died the morning of January 2 as a result of a single gunshot wound "which entered his head a little bit above and behind his right ear" and "travelled in a straight horizontal direction into his head." If Silver, who was six feet two inches tall, had been standing erect when shot, the path of the bullet would indicate that the gun was about five foot eleven inches from the ground when fired. The coroner recovered the bullet from Silver's head, marked it, and turned it over to the police. Hooten testified and identified the .22 caliber revolver he took from James on January 26 and turned over to the police, but did not then go into the details of that occurrence. Price testified essentially as described above, though he indicated he had picked James up not long after 7:30 p.m.[14] Price also identified the same .22 caliber revolver identified by Hooten as that which James had with him when he returned to Price's car immediately after Silver was shot. Price's conviction as an accessory after the fact and his probated sentence were brought out, and it was also established that as a condition of his probation he was to testify in James' trial. A firearms expert identified this .22 caliber revolver as that which fired the bullet taken from Silver's head. Detective Venezia testified that he investigated the scene on January 1, 1979, arriving after Silver had been taken to the hospital. Because he was a homicide detective, he did not assume charge of the investigation until the next day when Silver expired. He did, however, "canvass the neighborhood" for "eye witnesses to the shooting," but none were located. He stated that Silver's car was on Dauphine Street about thirty or thirty-five feet from the corner. He identified a photograph of 2631 Dauphine Street "in front of which this occurred" and another photograph of the scene depicting the left front of Silver's vehicle and his prescription glasses and umbrella on the ground. He stated that Silver's wallet was

never recovered, and was not at the scene or at the hospital to which he was taken. He also testified as to his June 22 interview with James. James' entire taped statement on that occasion was played to the jury and appears in the state record in transcribed form.

At the guilt-innocence stage of the December 1979 trial the state also introduced various exhibits, including the .22 caliber revolver used, the autopsy report on the seventy-one-year-old Silver, the laboratory report on the firearms testing, the tape of James' statement, and various photographs.

The defense evidence at this stage consisted of three witnesses. Price's probation officer testified she had informed him that as a condition of his probation he was required to testify in James' trial for this offense. Desiree Williams, James' former live-in girlfriend, and James' mother gave testimony indicating that it was Price who took James to the hospital after he was shot in the January 26 Hooten incident. Williams stated that Price had told her that on that occasion he was driving with James and "Edgar," they stopped, and "Antonio and Edgar went around the corner. And Edgar came running back. . . . And said that Tony had got shot." Price told Williams that "when he got there, Tony was laying [sic] on the ground," and he then took James to the hospital. Williams did not know who "Edgar" was. She also said that some time before he was shot she had seen James with a gun when at their residence. James did not testify at this stage.

The case was submitted to the jury with four possible verdicts: first degree murder, which required the jury to find "that the defendant actually killed the victim and that he acted with the specific intent to kill or inflict great bodily harm"; second degree murder, defined as "the killing of a human being when the offender is engaged in the commission of an armed robbery, even though he may have no intent to kill";

14. See also n. 2, *supra.* Price's testimony also reflects that James did not get out of Price's car and approach Silver until Price had parked his car at the corner.

manslaughter; and "not guilty." The jury returned a verdict of guilty of first degree murder. During deliberations a juror asked whether Price, having been convicted as an accessory, could subsequently be prosecuted for the underlying murder of Silver, and the court advised he could not; another juror asked for the specific intent instructions to be reread, and they were.[15]

At the sentencing stage, the state proved James' prior convictions for the January 23, 1979 Adams first degree murder, the Hooten January 26, 1979 armed robbery, a 1973 attempted armed robbery, and an August 1974 escape from confinement. It was also shown that James had a 1976 theft conviction. Hooten testified in more detail about the January 26 robbery, stating that as he was going to his parked truck late that evening he saw James and another unidentified man nearby looking at him; James said "let's do it," pulled the gun, and told Hooten to lie down on the front seat of his truck. Hooten went to the front truck door, didn't lie down, but said "you guys can have whatever you want." James with his left hand slipped off Hooten's wristwatch, and holding the gun in his right hand "pressed" it right behind Hooten's ear and told him to give up his wallet or he would blow his brains out. As Hooten reached for his wallet, James moved and Hooten grabbed the gun, which fell to the ground. Hooten retrieved the gun and "started firing." James and the other man fled. The police came, Hooten gave them the gun and told them he thought he had hit one of the men. The police arrested James later that night at the hospital. The state also proved that Adams, who was seventy-four years old when murdered January 23, 1979, was shot in the eye by the same .22 revolver used in the Hooten robbery and the Silver murder.

The defense evidence at this stage consisted of character-type testimony from James' sister, brother, mother, a friend, and Williams. The latter also stated "not that I know of" when asked if she had previously seen a gun like that used in the

Silver, Adams, and Hooten offenses. James took the stand and stated that with reference to the taped statement he gave Detective Venezia "everything on there is the truth." He also said he was present at the robbery of Silver "but I didn't do it." He denied shooting Silver. He admitted attempting to rob Hooten and on that occasion using the same gun as that used to kill Silver, but stated that he did not hold it against Hooten's head or threaten to blow his brains out. He related instead an improbable, confused story of backing into Hooten while holding the gun and looking away to see if police were coming. He also stated that on that occasion he and Edward Taylor had been riding with Price in Price's car. Price stopped, Taylor got out, and Price gave James the gun and Taylor and James, who had the gun, then "went around the corner." James then pulled the gun on Hooten and "I told him to give me his money," while Taylor took Hooten's watch. James admitted being present when Adams was robbed and killed, but denied shooting him or taking money from him. He said "about $35" was taken from Adams, of which he, James, got "about $10." He agreed that the money taken from Adams was "the same amount of money Mr. Silvers [sic] had in his wallet when he was murdered." James admitted that the weapon he used in the 1973 robbery was a .22 caliber pistol, but he stated that the pistol he had kept at his residence was a .25 caliber automatic. James admitted he was not working in December 1978 and January 1979 and was then getting "money from my people."

At the May 11, 1989 evidentiary hearing James was present throughout, but did not testify. The witnesses called by James were Ms. Miller, Mr. Johnson, who was James' counsel at the December 1981 trial, and two lawyers not involved in the case who testified as expert witnesses for James. The state called Detective Venezia. We concentrate on the testimony of Ms. Miller and Detective Venezia.[16]

---

15. All this was done in the presence of counsel, and no objections were made.

16. The testimony of the expert witnesses, who were not present at the trial and had read only selected portions of the December 1981 trial

Ms. Miller's testimony reflected that she lived with Dennie McIllwane in the house at 2631 Dauphine Street, which she owned. This house was on the corner, but fronted on Dauphine. Next to it was the Silvers' house, which also fronted on Dauphine. When facing in the direction of the one-way traffic on Dauphine, these houses were on the left side of that street. The door to Ms. Miller's house is on the side away from the corner, and on the corner side of the door is a window that does not reach to the floor. There was a street light at the corner where Ms. Miller's house was. On the evening of January 1, 1979, McIllwane and Ms. Miller were in the back or "third" room of this house, reading. She stated that "about approximately 8:30" p.m. her three dogs started barking in the front room. Ms. Miller went to the front room, "looked out the window, saw two men standing on the sidewalk." Ms. Miller "did not look at a clock or watch," but rather based her calculation of the time entirely on the fact that she on some unspecified date thereafter had been shown a police report that indicated that the police arrived there at 8:40 and her own estimate of the time elapsed between when she first looked out the window and the subsequent arrival of the police. She said "it happened about ten minutes before the police arrived. I really don't know what time that was." She said it could be nine to eleven minutes, and doubted it was fifteen minutes. After Ms. Miller observed the men she

"went and told the dogs to be quiet that there were men outside talking not to worry about it and I went back into the third room.... Dennie was there and the dogs didn't quit barking. A minute

or two passed, I guess, and he went to see if he could get them quiet.... The next thing I heard was him calling me up to the front door and said that Mr. Silvers [*sic*] ... is lying on the sidewalk and to call an ambulance."

She estimated "three, four minutes" elapsed from the time she saw the men until McIllwane called out to her. McIllwane also told her "someone knocked on the door, which he was going to anyway, so he opened the door" and a young black man, otherwise undescribed, was there and "told Dennie that there was a man lying on the sidewalk." Ms. Miller tried for "a minute or so" to use her phone, but it didn't work. She went out of her house, saw Silver's body, and went to the neighbors' house across the street, and asked them to call. She waited "a minute or two" outside the neighbors' house while they called the ambulance. While this was going on she saw the police arrive. When she had initially exited her house for the neighbors, no police or onlookers had arrived.

Ms. Miller said "there were people walking past the corner constantly." The dogs would not bark at people "just passing by the house"; if they did, "they would have barked all day long every day." But the dogs would bark "at something unusual happening right outside the door" such as people "stopped there with animated discussion" or, as stated at another place, "someone at the door." She said the "dogs hear very well."

The two men Ms. Miller observed were standing on the sidewalk, one in front of the right hand (Silver house) side of the stone steps leading to her door and the other slightly closer to Silver's house,

---

transcript (essentially nothing but some of Price's testimony and James' taped statement) and a summary furnished by James' counsel, was basically of a conclusory nature, namely their opinion to the effect that Ms. Miller's testimony may very likely have resulted in a life sentence. Their recollection was not always complete in material respects (for example, one did not recall the color hat James said he wore). The district court was not bound by this testimony—which was little different from a brief or argument in another form—and its failure to credit the conclusions of these witnesses was not clearly erroneous. Johnson's brief, mostly

conclusory testimony, added little beyond the fact that he didn't know of Ms. Miller and had he known of her he would have called her to bolster his theory of the case that James' version of the Silver murder, as given in his statement to Venezia, was correct, by indicating that two people—not James alone—may have been present when Silver was robbed and killed. Again, the district court was not bound to accept Johnson's view as to what the result of calling Ms. Miller would likely have been, and the court was not clearly erroneous in failing to do so.

about in front of the small space between the two houses. When Ms. Miller later went outside and saw Silver's body on the sidewalk, his head was by her steps and his feet were back toward his house.

Ms. Miller stated that the men she saw were "two young black men." She said they were "medium height, medium weight for young men ... nobody was seven feet tall or very short, just ... normal sized." James and Price were black and at that time were twenty-four and twenty-five years old respectively. The record does not disclose their size. Ms. Miller was not asked to identify either of them, though James was in the courtroom and there was no suggestion Price was unavailable. Ms. Miller, indeed, clearly indicated that she could not identify the two men she saw. When asked by the court if she could, she said "no, I saw the backs and side of these two men." She did not see their faces, their backs were to her; nor did she see their hands, or whether either held any object. She did observe that one man "was wearing a red plaid jacket" and she was "sure of that." One of the men was wearing a knit cap that was "kind of a putty color ... kind of khaki color." When asked if either was wearing a blue jacket, she said "not that I remember." As previously noted, James' statement reflects he and Price each wore solid blue jackets and James a red and blue knit hat. There is no contrary evidence.

When asked what the men were doing as she watched them, Ms. Miller replied "they appeared to be talking." She said she observed them "just long enough to see that they were standing there on the sidewalk talking." They did not appear "to be doing anything physically" other than "standing there talking." They did not "appear to be excited." She did not "see anything suspicious about them." She did not recall seeing or not seeing any vehicle parked on the street at that time (and apparently did not see Silver's body until she later went outside to have the neighbors make the call). She did not "hear any signs of anyone fleeing the scene," heard no "vehicle leaving" and heard no "shouts." She heard nothing she could identify as a gunshot,

but "there had been fireworks all the night before and on and off during that day if I would have heard anything in the way of a gunshot, I would have assumed it was more firecrackers."

As previously noted, Detective Venezia concluded that Ms. Miller's observations were not "of significance" and that she was not "a witness to anything germane to this case." He interviewed her before the May 11 hearing. He noted the mentioned differences in the clothing of the men she observed and that of Price and James. He stated that from where Ms. Miller was standing looking out the window she could not have seen Silver's body but would have been able to see the front of Silver's car. He explained that what Ms. Miller saw does

> "not coincide with what would be an armed robbery going down or a murder. If it was armed robbery she would have seen some movement. From Price's description and James' description there was movement. She saw two stationary people looking in the same direction apart from each other. And the knock on the front door a few minutes later by a black male indicated to me that the two people she observed were passersby that happened on to the body of Henry Silvers [*sic*]."

And, again,

> "what she observed does not fit what would be transpiring in a case with an armed robbery going down. What happened, happened quick, it was a run up type armed robbery, it happened extremely fast, with a quick get away with movement involved. What she observed, what she told me was two stationary objects staring at something for a number of seconds she watched them."

Venezia further pointed out that Silver was shot from close up and "if Silvers [*sic*] was standing there being robbed she would have seen him" and that the lights and wipers were on in Silver's car. Venezia noted that "normally with two people who are going to commit an armed robbery, one driving and one passenger, the passenger exits to commit the robbery, the driver

stays with the vehicle, they don't leave a car running and run down the block to commit a robbery and run back to the vehicle. . . ."

The district court concluded that Ms. Miller's "evidence was not sufficient to undermine confidence in the outcome of the proceedings." The court stated, *inter alia*,

"Ms. Miller lived in a well-populated neighborhood and testified regarding an incident which occurred on New Year's Day, 1979. . . . There is no way to determine how long Mr. Silvers [*sic*] had been lying prostrate near Ms. Miller's apartment before the police arrived or before someone knocked on the door and reported to Denny McElveen that a man was lying on the sidewalk.

"At whatever time Ms. Miller saw the two men, she saw two men standing talking, which was not compatible with the actions of two armed robbers. One of the men, according to Ms. Miller, definitely was wearing a plaid jacket. When arrested Antonio James was clear in his statement that both he and Levon Price were wearing solid blue jackets and he was wearing a red and blue colored knit hat. . . . It is unlikely that James, who should know his own clothing, was wearing a plaid jacket and did not know it.

"It is clear that Ms. Miller saw two passersby. This is not unusual in a well-populated neighborhood on New Year's Eve [*sic*]. It is possible that one of those men later knocked on her door and reported the body of Mr. Silvers [*sic*]. But, considering the ambiguity regarding time, the plaid jacket, and the actions of the two men talking, it is not reasonable to conclude that the testimony of Thomasina Miller, if given at trial, would probably have resulted in a different trial outcome."

We agree with the district court. To say that Ms. Miller saw Price and James would be the rankest speculation, and inconsistent with the evidence. Ms. Miller's estimate of the time is without the benefit of clock or watch and rests on the assumption that the police arrived at 8:40 p.m. There is no evidence that they did. They were not called until 8:42 p.m. and the only evidence of when they arrived is the notation 8:44 p.m. in the report's unexplained "time handled" blank. Nor is there any hard evidence of just when Silver was shot, other than the notation on the report that another neighbor heard screams—followed by a shot—"at about 8:30 p.m." Ms. Miller's clear description of the clothing the men she saw were wearing is inconsistent with what the undisputed evidence shows James and Price were wearing.[17] Moreover, her description of the two men standing still on the sidewalk unexcitedly talking is inconsistent with their being James and Price under the only evidence of how the murder-robbery occurred. According to both James and Price, as they drove by Silver was already parking. That is why they determined to stop. They drove to the corner, parked on the cross street, and then one or both returned to Silver's car as he was getting out of it. His lights were on. According to James, Silver pushed his umbrella at Price who retreated a little and then shot Silver, putting the gun to near his ear (as Hooten said James did to him), as Silver was moving toward his house. Price, according to James, grabs the wallet from the fallen Silver and both run back to Price's car. Nothing in the evidence ever has James and Price standing still on the sidewalk. Nor would that be likely. But what Ms. Miller saw was simply two people standing still on the sidewalk, no third person, no car or lights, no movement, no noise, or the like.[18]

**17.** James' counsel argue he was mistaken about other colors, as for example, saying in his statement to Venezia that Silver's umbrella "if I'm not mistaken, I think it was red and black stripes" when it was actually brown and green, and describing Silver's car as "gold colored" instead of brown. Venezia, however, tested James on other colors—including the phone book—and he apparently answered correctly.

There is no evidence James had difficulty seeing colors. He would more likely know what he and Price were wearing than the colors associated with Silver, whom he was with only for fleeting and tense moments at night. Nor is there any evidence that James did not accurately describe what he and Price wore that night.

**18.** And even if, contrary to the evidence, the illogical and unsupported assumption were to

We agree with the district court that there is no "reasonable probability" that had Ms. Miller's evidence been offered at trial "the result of the proceeding would have been different." We also agree that the absence of Ms. Miller's testimony does not "undermine confidence in the outcome" of James' December 1981 trial, either as to guilt or sentence.[19]

We overrule James' complaints on appeal respecting undisclosed exculpatory evidence.

## II. *Mills Claim*

■ James' remaining claim on appeal is that the jury may have been led to believe, principally by the sentencing verdict form, that it "had to be unanimous in its finding of any or all mitigating circumstances," or that it "must 'unanimously' agree on a finding of mitigation before it can 'unanimously' agree on a life sentence" and thus that "the jurors were precluded from individually considering any mitigation offered." James claims that in substance the sentencing instructions and verdict form here suffer from the same defect found in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). We disagree.

In *Mills* the crucial defect found was that the jury, by virtue of the wording of the verdict form and the court's instructions, "well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such [mitigating]

circumstance." *Id.,* 108 S.Ct. at 1870. The *Mills* verdict form, set out at 108 S.Ct. 1870–72, was divided into three numbered sections, followed by a "determination of sentence" section. In section I ten specific aggravating circumstances were listed in separate numbered paragraphs, each of which had a blank for a "yes" or "no" answer, and section II listed in separate numbered paragraphs seven specific mitigating circumstances, each of which had a blank for a "yes" or "no" answer.[20] At the beginning of section II the verdict form contained the following:

> " 'Based upon the evidence we *unanimously find* that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by A PREPONDERANCE OF THE EVIDENCE and each mitigating circumstance marked 'no' has not been proven by A PREPONDERANCE OF THE EVIDENCE:' " *Id.* 108 S.Ct. at 1871 (emphasis added).

Immediately following the conclusion of section II, the verdict form read as follows:

> " '*Section III*
>
> 'Based on the evidence we unanimously find that it has been proven by A PREPONDERANCE OF THE EVIDENCE that the mitigating circumstances marked "yes" in Section II outweigh the aggravating circumstances marked 'yes' in Section I.

---

be made that Ms. Miller saw Price and James, this would have only a tenuous bearing on James' guilt or sentence. It would not of itself suggest that James did not shoot Silver behind the ear with the gun with which he had almost shot Hooten in the same place and which killed Adams, of whose first degree murder James was convicted. It would at most contradict Price's testimony that Price stayed in the car; James admitted that he, James, did not stay in the car. The jury obviously had doubts about whether Price was trying to minimize his own role, but his doing so is in no sense inconsistent with James being the trigger man.

**19.** Moreover, it appears to us that even if Miller's testimony can be characterized as favorable to James at all, we think it nevertheless fits well within what the Supreme Court had in mind in *Bagley* when it stated: "Furthermore, a

rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused no matter how insignificant would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." *Id.,* 105 S.Ct. at 3380, n. 7.

**20.** There was also a concluding numbered paragraph in section II, namely: "8. Other mitigating circumstances exist, as set forth below:" followed by blank lines on which such might be written in. In respect to this part of the form, "[t]he judge explained to the jury that if *it found* any such 'other' mitigating circumstances, it must list them in the space provided, and '[i]f you *find* no other mitigating circumstances *then* you make *no* entry upon those lines under number eight.' " *Id.,* 108 S.Ct. at 1868, 1872 (emphasis added).

— —
yes  no' "
*Id.* (emphasis added).

There then appeared the "determination of sentence" section in which the jury was directed to enter in the blank provided a verdict of either death or life imprisonment "according to the following instructions." *Id.* The instructions were: to enter life imprisonment if either (1) "all of the answers" in section I (specific aggravating circumstances) were "no," *or* (2) section III (weighing) was answered "yes"; and to enter death if either (3) "all of the answers" in section II (specific mitigating circumstances) were "no" *or* (4) section III (weighing) was answered "no." *Id.*

As the *Mills* court noted, under the instructions there could not be a "yes" answer to any of the section II parts unless the jury all agreed that the one particular mitigating circumstance inquired about in that part was found to exist. And, "[s]ection III instructed the jury to weigh only those mitigating circumstances marked 'yes' in section II. Any mitigating circumstances not so marked, even if not unanimously rejected, could not be considered by any juror." *Id.*, 108 S.Ct. at 1868. The result of this was that the jury, if it found any aggravating circumstances, was *required* to return a death sentence even if (1) eleven jurors had agreed on six specific mitigating circumstances and concluded that the death sentence would accordingly be inappropriate *or* (2) all twelve jurors felt there were some mitigating circumstances that would render death inappropriate, but all twelve could not "agree that the same mitigating circumstance was present." *Id.* 108 S.Ct. at 1865.

This case is wholly unlike *Mills,* and the Louisiana statutory scheme is significantly different from that of Maryland. Under the Louisiana procedure, the jury is not asked or authorized to make any *finding* respecting mitigating circumstances, general or specific; nor is it required to impose a

death sentence if the jury finds aggravating circumstances but no mitigating circumstances. As we said in James' prior habeas case, "even if one or more aggravating circumstance is found, the jury is not required to impose the death penalty, *whether or not* it finds *any mitigating circumstance." James v. Butler, supra,* 827 F.2d at 1013 (emphasis added).

The instructions and verdict form here are entirely consistent with this and wholly dissimilar from those in *Mills.*

At the beginning of trial, the judge orally outlined the guilt-innocence and possible sentence stages to the jury panel being *voir dired,* stating in pertinent part:

"At the sentencing trial, the jury shall consider the evidence and unless the jury finds beyond a reasonable doubt that at least one of the statutory aggravating circumstances exist, a verdict of death sentencing cannot be returned. As stated before, the jury may return either death or life imprisonment without benefit of probation, parole or suspension, which recommendation must be unanimous. Said verdict is to depend upon the jury's findings of what evidence is presented at the sentencing hearing. A sentencing hearing, if it occurs, will result in a death sentence *only* upon the *unanimous* recommendation of the jury. And if the jury unanimously finds the sentence of death inappropriate, it shall recommend a sentence of life imprisonment without benefit of probation, parole or suspension.... *If the jury is unable to agree* on a recommendation, *the Court shall impose a sentence of life imprisonment* without benefit of probation, parole or suspension of sentence." (Emphasis added).[21]

Following conclusion of the sentencing stage evidence, the court orally instructed the jury in relevant part as follows:

"A sentence of death shall not be imposed unless the jury finds beyond a

21. This instruction continued by stating: "Now, in the event the jury would return a verdict of second degree murder or manslaughter, there would be no sentencing hearing or sentencing trial. And if the jury re-

turns a verdict of not guilty, the defendant would be discharged. These preliminary instructions are merely designed to inform the jury as to what will occur in this trial, what will possibly occur in this trial."

reasonable doubt that at least one statutory aggravating circumstance exists and after *consideration* of any mitigating circumstance recommends that the sentence of death be imposed. The jury will be furnished with a copy of the statutory aggravating and mitigating circumstances. The aggravating circumstances provided by law are:

".... [listing of aggravating circumstances]

"The mitigating circumstances provided by law are the following:

".... [listing of mitigating circumstances concluding with "Any other relevant mitigating circumstance."]

"A sentence of death shall be imposed *only* upon the *unanimous* recommendation of the jury. If the jury unanimously finds the sentence of death inappropriate it shall recommend a sentence of life imprisonment without benefit of probation, parole or suspension of sentence." (Emphasis added).

After the sentencing arguments, the court again briefly orally instructed the jury, the instruction including the following:

"A sentence of death, this is the code, shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists. And after *consideration* of any mitigating circumstances, recommends that the sentence of death be imposed." (Emphasis added).

On completing the instructions, the court then furnished the jury a written list of the statutory aggravating and mitigating circumstances, and, on a separate sheet of paper, the verdict form, reading as follows:

"The form of Jury recommendation shall be as follows:

'Having found the below listed statutory aggravating circumstance or circumstances and, after consideration of the mitigating circumstances offered, the jury recommends that the defendant be sentenced to death.

'Aggravating circumstance or circumstances found:

_____

_____

_____

_____

New Orleans, Louisiana, December ——, 1981.

    (Signed) _____
              Foreman.'

OR

_____

_____

'The jury unanimously recommends that the defendant be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence.

New Orleans, Louisiana, December ——, 1981.

    (Signed) _____
              Foreman.' " [22]

The jury was *expressly* told that its death verdict had to be *unanimous*.[23] It was *never* told that it was required or authorized to make any *finding* respecting any specific mitigating circumstances, or even respecting mitigating circumstances generally. It was only told that a death verdict required the jury to *"find"* one or more aggravating circumstances and give *"consideration* of any mitigating circumstances" (emphasis added). There is thus a contrast between "find" and "consideration." The verdict form also reflects this,

---

**22.** The jury returned a death verdict, the foreman signing the top part of the form and filling in the blanks for "aggravating circumstance or circumstances found" as follows:

    "(a) The offender was engaged in the perpetration of an armed robbery

    "(c) The offender was previously convicted of an unrelated murder and has a significant prior history of criminal activity."

**23.** Of course, a life imprisonment *verdict* also had to be unanimous; if the jury was not unanimous on one or the other, there simply was no verdict. Although Louisiana law requires that in such an instance the trial court impose a life sentence—as the jury was told here—the United States Constitution does not require that a hung (or less than unanimous) jury in a capital case entitle an accused to a life (or lesser) sentence, as opposed to a mistrial.

stating that any recommendation of death is made "having *found*" the specified aggravating circumstances and "after *consideration* of the mitigating circumstances *offered*" (emphasis added). Note again that the mitigating circumstances to be considered are those *"offered," not* those *found.* There is no place on the verdict form for the jury to list any specific mitigating circumstances found, or whether it found that there were any mitigating circumstances. Nor do the instructions or the verdict form suggest that if an aggravating circumstance is found, and there are no mitigating circumstances, the jury must return a death verdict or that it has anything less than complete discretion to return a life verdict.

In sum, James' *Mills* argument is wholly without merit.

### Conclusion

Having rejected each of James' complaints on appeal as to the district court's rulings, we accordingly affirm the judgment denying habeas relief.

AFFIRMED.