**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 93-3201**
_____

**LEO WILSON,**

**Petitioner-Appellee,**

**versus**

**JOHN P. WHITLEY, Warden,**
**Louisiana State Penitentiary,**

**Respondent-Appellant.**

_____

**Appeal from the United States District Court**
**for the Eastern District of Louisiana**
_____

(July 28, 1994)

Before SMITH and BARKSDALE, Circuit Judges, and WALTER, District
Judge:[1]

RHESA HAWKINS BARKSDALE, Circuit Judge:

Louisiana challenges the habeas relief granted Leo Wilson on
his state conviction for armed robbery, the issue being whether the
prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not
disclosing a police report that could have been used to impeach the
credibility of one of the two victims (Leonard Pierce), the sole
witness to definitely identify Wilson. The determinative question
is whether the report was "material"; this is, whether "there is a
reasonable probability that, had the [report] been disclosed to
[Wilson], the result of the [jury trial] would have been

_____

        [1]    District Judge of the Western District of Louisiana,
sitting by designation.

different." ***United States v. Bagley***, 473 U.S. 667, 682 (1985). This case presents a close call; but, because we conclude that there is not a reasonable probability that the result of the trial would have changed, we **REVERSE** and **REMAND**.

I.

In March 1983, a jury convicted Wilson for the armed robbery in 1982 of Pierce and Charles Bowie. He was sentenced to two concurrent 50-year terms of imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence. The conviction was affirmed on direct appeal. ***State v. Wilson***, 463 So. 2d 655, 656 (La. Ct. App. 4th Cir. 1985), *writ denied*, 466 So. 2d 466 (La. 1985).

After exhausting state remedies, ***State v. Wilson***, 587 So. 2d 691 (La. 1991), Wilson sought federal habeas relief, claiming, *inter alia*, that his conviction was obtained in violation of due process because the prosecution suppressed material evidence (police report) favorable to his defense. After an evidentiary hearing, the magistrate judge found that the prosecution had not disclosed the report, which included Pierce's description of the robbery to the investigating officers. And, after comparing the versions of the robbery presented in the report and in Pierce's trial testimony, the magistrate judge found that they differed in material respects, and recommended that relief be granted pursuant to the due process claim.[2] In a most thorough opinion, the

---

[2] Wilson also claimed that his trial counsel was ineffective for failing to object to the judge entering the jury room to deliver photographs used for a photographic line-up, asserting that this tended to indicate the court's endorsement of Pierce's in-court identification. Neither the magistrate judge

district court adopted the recommendation and granted habeas relief.

                                   II.

In **Brady v. Maryland**, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution".  373 U.S. at 87.  "The guiding principle of **Brady** is that a jury should be permitted to hear and evaluate all relevant evidence going to a defendant's guilt or punishment".  **Fulford v. Maggio**, 692 F.2d 354, 357 (5th Cir. 1982), *rev'd in part on other grounds*, 462 U.S. 111 (1983).  As stated in **United States v. Bagley**:

> The **Brady** rule is based on the requirement of due process.  Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.  Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

473 U.S. at 675 (footnotes omitted).

For obvious due process (fair trial) reasons, impeachment evidence, as in issue here, is covered by **Brady**.  **United States v. Bagley**, 473 U.S. at 676.  The Court had earlier held in **Giglio v. United States**, 405 U.S. 150 (1972), that, "[w]hen the `reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls

---

nor the district court reached this Sixth Amendment claim.

within [*Brady*'s] general rule".  *Id*. at 154 (quoting *Napue v.*

*Illinois*, 360 U.S. 264, 269 (1959)).

To prevail under *Brady*, Wilson must show that (1) the report

was not disclosed,[3] (2) it contained evidence favorable to his

defense, and (3) that evidence was material.  *United States v.*

*Sink*, 586 F.2d 1041, 1051 (5th Cir. 1978), *cert. denied*, 443 U.S.

912 (1979).  The first factor is not in issue.[4]

A.

[3]      "*Brady* rights are not denied where the information was fully available to the defendant and his reason for not obtaining and presenting such information was his lack of reasonable diligence".  *United States v. Dean*, 722 F.2d 92, 95 (5th Cir. 1983) (deputy sheriff who testified for defendant easily could have told defendant the content of his police report and grand jury statements); *see also* *Smith v. Black*, 904 F.2d 950, 964 (5th Cir. 1990) (*Brady* "exempts information that the defense could have obtained from other sources by exercising reasonable diligence"), *cert. granted and judgment vacated on other grounds*, ___ U.S. ___, 112 S. Ct. 1463 (1992), *reinstated in relevant part on remand*, 970 F.2d 1383 (5th Cir. 1992); *United States v. Wicker*, 933 F.2d 284, 292-93 (5th Cir.) (no *Brady* violation where defense made no specific request for witness fee information, defense counsel was aware that government was paying witness' hotel expenses during trial, and procedure for payment of witness fees is public information), *cert. denied*, ___ U.S. ___, 112 S. Ct. 419 (1991); *Fulford v. Maggio*, 692 F.2d at 357 (no reversible error where disputed police report was used by defense at trial for purposes of impeachment, despite the fact that the report was, in all probability, wrongfully withheld by the prosecution); *United States v. Fogg*, 652 F.2d 551, 559 (5th Cir. 1981) (considering defendant's close relationship with two witnesses who testified for Government at trial, defendant could have obtained the contents of their grand jury statements before trial), *cert. denied*, 456 U.S. 905 (1982).

[4]      Under Louisiana law in effect at the time of Wilson's trial, police reports were not discoverable. *See* *Kirkpatrick v. Whitley*, 992 F.2d 491, 496 (5th Cir. 1993).  In 1984, Louisiana amended its public records statutes to provide for public disclosure of initial reports. *See* *Hudson v. Whitley*, 979 F.2d 1058, 1061 (5th Cir. 1992).  At the federal evidentiary hearing, Wilson testified that, in 1989, his mother obtained the report from the district attorney's office.  And, at oral argument, the State conceded that the report was not available to Wilson until the post-conviction proceedings.

In order to determine whether the report contained evidence favorable to Wilson, it is necessary to contrast, in detail, the report and Pierce's trial testimony. The report (narrative section) describes the robbery as follows:

> Leonard Pierce stated [to] reporting officers M. Stewart and R. Monteverde that on 9-10-82\4:30 PM he and Charles Bowie were walking lake bound on A. P. Tureaud toward Broad St. Upon reaching N. Broad St. and A. P. Tureaud he noticed 2 unk blk male behind him. L. Pierce didn't pay any attention to them and continued home down Florida Ave. Upon reaching Florida Ave. and A. P. Tureaud L. Pierce saw a third unk NM come from behind the pumping station toward he and C. Bowie. L. Pierce also states that one first two unk NM came from behind and demand money from he and C. Bowie with 4" folding buck knife. They refused. Then the first unk NM, with knife struck L. Pierce in face and struggle [e]nsued. L. Pierce was then forced on ground by NM #1 who jabbed L. Pierce in lower back and buttock telling him to stay [on the] ground and to give up the money. Wanted Subject #1 then went into L. Pierce's back pocket removing his wallet and taking 1 $5.00 bill from his wallet.

> Leonard Pierce also stated that w[h]il[e] this was going on wanted subject #2 took $6.00 from Charles Bowie and the third wanted subject stood watch. All three wanted subjects heard a car coming and fled down Florida to Broad St. then unknown. Mr. Pierce and Bowie then tried to follow them but no avail. Mr. L. Pierce then continued home where he phoned the police. He also noticed that his pants were cut and it was then he noticed a small incision made by wanted subject #1 in his lower left buttock....

> Charles Bowie was contacted by phone by Officer M. Stewart and confirmed the above statement by L. Pierce. Mr. C. Bowie was not injured during the armed robbery.

As discussed *infra*, of critical importance is the fact that Pierce did not sign the report, and there is no evidence that he otherwise adopted the narrative as his own statement. (Pierce did not testify at the federal evidentiary hearing.)

At trial, Pierce gave the following account of the robbery:

> I was going down A. P. Touro. At the end of A. P. Touro and Broad, I normally go behind the pumping station across the railroad tracks .... As we were walking around the pumping station, ... a field was on my left and the pumping station was on my right. A guy cut across the field. I saw another guy come from the pumping station and another one came from behind me with a knife. The guy with the knife put the knife to my back and told me to give him my money and I refused and the guy that cut across the field came up to me and he tried to go into my pockets and I also stopped that. ... I had one of his arms, I broke free and he hit me knocking my glasses off.

Pierce identified Wilson as the person who struck him. He testified that, before his glasses were knocked off, he got a good look at Wilson, and that

> [a]fter he knocked my glasses off, I turned to see what had happened, if they had broken or not. When I turned, he [Wilson] grabbed me from behind and wrestled me to the ground.

> I tried to get off the ground. That is when the person came up behind me with the knife. He had gone over to my friend and he held him up and he gave him his money and he came back over to me with the knife and the knife was placed in my side. I had to arch my back or I would have been stabbed. They went through my pockets and took the money out and just dropped the wallet. They took the knife and they were pricking me with the knife. He must have hit me one good time and I didn't even know it, but at that time, that is when I was stabbed. A car came and the two got up and the look-out was already down by the corner and they all ran.

Pierce testified that Wilson was not the one who stabbed him, but instead was the one who was holding him; that Wilson held a knife to his back, however, at some point during the incident; and that he was "absolutely sure" of his identification, and had "no doubt" that Wilson was the person who robbed him, knocked off his glasses, held the knife to his back, and punched him. On cross-

examination, Pierce testified that he first saw Wilson when Wilson "cut across the field". He testified further that the closest Wilson got to him was "[f]ace to face", "less than a foot away from my face".

To the extent there are discrepancies between the report and Pierce's testimony, they are favorable to Wilson, because they could have been used to impeach Pierce's credibility and his identification of Wilson.[5] Accordingly, we turn to whether the

---

[5] The district court held that there were material discrepancies between the report and Pierce's trial testimony concerning the manner in which the three assailants approached the victims, and the identity of the person who struck Pierce in the face, pushed him to the ground, and took the money from his pocket. It concluded that the information in the report was favorable to Wilson, finding that, according to the report, Wilson was "not clearly implicated in the robbery at all".

The report does implicate Wilson. As the district court noted, Wilson fits the report's description of "Wanted Subject #2", discussed *infra*. The report states that "wanted subject #2 took $6.00 from Charles Bowie". Accordingly, the report is not exculpatory as to Wilson; instead, it implicates him as one of the three perpetrators of the armed robbery, each of whom aided and abetted the others.

The jury instructions are not included in the record; therefore, we are unable to confirm that the jury was instructed on Louisiana law governing the liability of principals. Under Louisiana law, "[a]rmed robbery is the theft of anything of value from the person of another or which is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon". *State v. Lawry*, 430 So. 2d 153, 155-56 n.4 (La. Ct. App. 2d Cir. 1983) (quoting La. Rev. Stat. 14:64). A person is criminally liable as a principal, "whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime". *Id.* at 155 n.3 (quoting La. Rev. Stat. 14:24).

Considering only the version of the robbery described in the report, Wilson was a principal. *See State v. Antoine*, 444 So. 2d 334, 337 (La. Ct. App. 1st Cir. 1983) (defendant participated in armed robbery as principal, even though he did not hold the guns or personally empty the cash register, where he "knew in advance of [co-defendants'] plans, took part in the discussion of the

discrepancies are material.

B.

As noted, the Supreme Court held in **United States v. Bagley** that, for **Brady** purposes, it had rejected any distinction between impeachment evidence and other exculpatory evidence. 473 U.S. at 676. It reasoned that impeachment evidence is "evidence favorable to an accused", within the meaning of **Brady**, "so that, if disclosed and used effectively, it may make the difference between conviction and acquittal". **Id.** The Court adopted the following materiality standard for any prosecutorial failure to disclose evidence favorable to the accused:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome.

**Id**. at 682.

"The question of materiality present in cases in which the accused complains of prosecutorial suppression of material evidence is ... [a] mixed question[] of law and fact calling ultimately for a legal determination".[6] **Davis v. Heyd**, 479 F.2d 446, 451 (5th

_____

proposed robbery, knew [one of the co-defendants] had the gun, received the stolen money, and drove the vehicle which enabled them to flee the scene of the crime"); **Lawry**, 430 So. 2d at 155 (evidence that defendant "chose the target of the robbery, recruited two men to perform the robbery, supplied guns to be used in the robbery and drove the getaway car" sufficient to prove defendant's guilt as a principal).

[6] The parties assert incorrectly that the district court's materiality "finding" is subject to the clearly erroneous standard of review. **Bagley**'s formulation of the materiality standard (whether there is a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed) is derived from **Strickland v.**

Cir. 1973); *see also* **Ballinger v. Kerby**, 3 F.3d 1371, 1375 (10th Cir. 1993) ("The question of materiality and the possible effect of ... withheld evidence on the verdict[] is a mixed question of fact and law") (internal quotation marks, citation, and brackets omitted); **United States v. Rivalta**, 925 F.2d 596, 598 (2d Cir.), *cert. denied*, ___ U.S. ___, 112 S. Ct. 215 (1991) (same).

1.

"**Bagley** evidences concern with `any adverse [e]ffect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case'". **Smith v. Black**, 904 F.2d at 966 n.4 (quoting **Bagley**, 473 U.S. at 683 (opinion of Blackmun, J.)). Accordingly, although the **Bagley** materiality standard applies to a specific request, a general request, or no request at all, "it may be proper to weigh in favor of the accused `the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value'". **James v. Whitley**, 926 F.2d 1433, 1439 (5th Cir. 1991) (quoting **Bagley**, 473 U.S. at 682 (opinion of Blackmun, J.)).[7]

_____

**Washington**, 466 U.S. 668, 698 (1984). **Bagley**, 473 U.S. at 682 (citing **Strickland**, 466 U.S. at 694). In **Strickland**, 466 U.S. at 698, the Court held that the same inquiry in the context of an ineffective assistance of counsel claim presented a mixed question of law and fact.

[7] The passage from **Bagley**, quoted in **James**, is from Justice Blackmun's opinion, joined only by Justice O'Connor. *See* **Bagley**, 473 U.S. at 668; *see also id.* at 685 (opinion of White, J., joined by Burger, C.J., and Rehnquist, J.) ("Given the flexibility of the standard and the inherently factbound nature of the cases to which it will be applied, ... I see no reason to attempt to elaborate on the relevance to the inquiry of the specificity of the defense's request for disclosure, either generally or with respect to this case".). However, in **Pennsylvania v. Ritchie**, 480 U.S. 39 (1987), a majority of the Court cited with approval that portion of Justice Blackmun's

Prior to trial, Wilson made only a general request for *Brady* material ("Motion for Bill of Particulars and Discovery and Inspection"): "Did the State obtain or does the State have any exculpatory evidence or evidence favorable to the defendant and if so, what is the nature and description of such evidence?"  The State responded, "None".

The trial transcript indicates, however, that Wilson's counsel knew that the report existed.  During cross-examination of Officer Bayard, who became involved in the investigation two months after the robbery,[8] Wilson's counsel asked when the report was dated, and who wrote and signed it.  Bayard responded that the report was dated September 10, 1982 (the day of the robbery), but could not

opinion, noting that, "[a]lthough the obligation to disclose exculpatory material does not depend on the presence of a specific request, we note that the degree of specificity of Ritchie's request may have a bearing on the trial court's assessment on remand of the materiality of the nondisclosure". *Id*. at 58 n.15 (quoting *Bagley*, 473 U.S. at 682-83 (opinion of Blackmun, J.)).

Our court has also cited and applied Justice Blackmun's opinion regarding the specificity of the request.  *See James*, 926 F.2d at 1439 (citing *Bagley*, 473 U.S. at 682-83 (opinion of Blackmun, J.)); *Smith v. Black*, 904 F.2d at 963 n.2 (quoting *Bagley*, 473 U.S. at 682-83 (opinion of Blackmun, J.)) ("*Bagley* did regard the request's specificity as pertinent to the assessment of *materiality*, in that `an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist.'  The Court noted that specificity did not affect the different standard of review but figured only as one aspect of the `totality of circumstances'".) (emphasis in original); *United States v. Weintraub*, 871 F.2d 1257, 1261 n.6 (5th Cir. 1989) (citing *Bagley*, 473 U.S. at 683 (opinion of Blackmun, J.)) ("The fact that the defendant made a specific request is ... one factor a reviewing court may consider in assessing the materiality of the withheld evidence").

[8]     Bayard showed photographs to Pierce, from which Pierce identified Wilson as one of the robbers.

recall the author's name. The prosecutor stated that Stewart and Monteverde were the officers who initially interviewed the victims and prepared the report. At Wilson's counsel's request, the trial court ordered the issuance of subpoenas for those officers.

When Wilson's counsel attempted to cross-examine Bayard about the report's contents, the court sustained the State's hearsay objection. In any event, Wilson's counsel cross-examined both victims about their statements to the police officers on the day of the robbery. During the presentation of defense witnesses, the trial court noted that one of the two subpoenaed officers (not identified by name) had entered the courtroom. The identity was fixed subsequently at the federal evidentiary hearing, when Richard Monteverde, the partner of Michael Stewart (the report's author, who died prior to the hearing), testified that he was not the officer referred to in the trial transcript. The record therefore supports the inference that the report's author, Stewart, was present at trial. He did not testify.

Wilson's trial counsel testified at the federal evidentiary hearing that he did not receive a copy of the report prior to or during trial, and did not learn of the report until the day before the evidentiary hearing. Wilson's federal habeas counsel questioned trial counsel about the references to the report in the trial transcript:

> Q. When you questioned the officers ... and the existence of a report was discussed, did you at that time know exactly what report that was?
>
> A. No .... But it was obvious that there was some serious differences in the descriptions given beforehand and [Wilson] [*sic*] at the time from what

I had come to learn during the trial of the case. And that's all the questions are for[,] to attempt to determine from the police officer who handled the report[,] the prior descriptions.

It is apparent that, during trial, Wilson's counsel was aware, at the very least, that a report existed, but was unaware of its contents. After learning at trial about the existence of the report, however, Wilson neither requested a copy nor asked the court to review it, *in camera*, to determine whether it contained any favorable evidence. And, although the trial judge, at the request of Wilson's counsel, issued subpoenas for the investigating officers, and although Officer Stewart, the report's author, was present at trial as a result and available to testify, Stewart was not called as a witness.

In light of these facts, we cannot conclude that the prosecutor's failure to respond to Wilson's general request for *Brady* material adversely affected trial counsel's strategy. Accordingly, Wilson's *Brady* request is not entitled to favorable weight in our assessment of the materiality of the undisclosed information. *See Smith v. Black*, 904 F.2d at 966 n.4.

2.

In assessing the materiality of undisclosed impeachment evidence, "we must consider the nature of the impeachment evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed testimony". *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989).[9] "The materiality

---

[9] *See Drew v. Collins*, 964 F.2d 411, 419-20 (5th Cir. 1992) (incremental impeachment value from minor inconsistencies between witness' taped and written statements did not raise a reasonable probability that, had the statement been disclosed to

of **Brady** material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state". **Edmond v. Collins**, 8 F.3d 290, 293 (5th Cir. 1993) (internal quotation marks and citation omitted). For example, when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material, **Weintraub**, 871 F.2d at 1262; but, on the other hand, "where the withheld evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material".[10] **Id**.

Nearly all of the evidence at trial consisted of Pierce's identification testimony, supported by the testimony of Bowie, who was able to identify Wilson only by his build.[11] There was no other corroborating evidence of Wilson's guilt. Thus, Pierce's eyewitness testimony was essential to Wilson's conviction. Our court has noted that "[i]t is a commonplace that eyewitness testimony is highly regarded by juries, rather more than its objective appraisal might warrant". **Smith v. Black**, 904 F.2d at 967. Accordingly, in determining whether there is a reasonable

---

defense counsel, the outcome of the proceeding would have been different), *cert. denied*, ___ U.S. ___, 113 S. Ct. 3044 (1993).

[10] *Cf*. **Williams v. Whitley**, 940 F.2d 132 (5th Cir. 1991) (remanding for evidentiary hearing on materiality of police report in which victim's wife, who was the only witness to identify defendant as the murderer, admitted to having visited a methadone clinic shortly before the murder).

[11] Bowie testified at trial that he did not get a chance to look at Wilson's facial features.

probability that the outcome of the trial would have been different, our focus is on whether the report contains information that could have been used, on cross-examination, to significantly undermine Pierce's credibility.[12]

As noted, of critical importance to our analysis of the materiality of any discrepancies is the manner by which the report was prepared. Monteverde, one of the officers who interviewed Pierce within hours of the robbery, testified at the federal evidentiary hearing that the report was prepared by his partner, Stewart, who died during the year prior to the hearing; that he had no independent recollection of the events reflected in the report; but that "[t]he normal procedure is to interview the victim or witness, ... write down the key points and then very soon thereafter relocate to an area where you can reflect and write the report, the narrative".[13] Monteverde testified that the report is supposed to accurately reflect the victim's statements to the officers. He testified further, however, that it is not a verbatim

---

[12]    The district court held that the report was material because, considering "the marked differences between Pierce's initial statement to the police and his trial testimony, the report would have provided Wilson with substantial information with which to impeach Pierce's testimony". It concluded that, because "Pierce was the sole eyewitness to identify Wilson pre-trial, impeachment of his testimony could have affected the outcome of the trial".

[13]    In response to questioning by the magistrate judge, Monteverde reiterated that the "normal procedure" in preparing reports was to "relocate to a quiet place whether it be a donut shop or back to the station where we could take our time and write it as accurately as we can from the information we would have received".

transcription of the victim's statements.[14]

The first discrepancy between the report and Pierce's testimony involves the assailants' approach. The report states (Pierce is reported as having said) that two men came from behind Pierce and a third from behind the pumping station. Pierce testified that he saw one man cut across a field on his left, another came from behind the pumping station, and another came from behind him with a knife.[15] But, the report contains, in addition to the narrative in which Pierce's description of the assailants'

_____

[14] *See **Weintraub***, 871 F.2d at 1260, which involved a **Brady** claim based on statements made during a witness' trial testimony that were not included in a "DEA-6" report summarizing the witness' statements to investigators. Our court noted that the DEA-6 reports were not verbatim accounts of the witness' pretrial statements, but instead were "`short, concise, summaries of the witnesses' version of the facts as recounted to the agents'". *Id*. at 1260 (quoting **United States v. Merida**, 765 F.2d 1205, 1215 (5th Cir. 1985)). "Thus, the fact that a specific piece of trial testimony is not included in a DEA-6 is not necessarily a reflection on the credibility of the witness, but instead may be the result of an agent's transcription techniques". **Id**. Considering "the realities of this summation process", our court concluded that the prosecution was not under a duty to disclose the DEA-6 report. **Id.**

*Cf.* **United States v. Scaglione**, 446 F.2d 182, 184 (5th Cir.) (internal quotation marks and citations omitted), *cert. denied*, 404 U.S. 941 (1971):

> [Under the Jencks Act, 18 U.S.C. § 3500,] [t]he inquiry is whether the witness has made as his own the product of the investigator's selections, interpretations and interpolations[,] ... so that the defense should be permitted to use it to impeach him. If the witness has not done so it is grossly unfair to use the language, interpretations and interpolations of someone else to impeach him.

[15] The district court found that this was a material difference because, in the trial version, Pierce had a greater opportunity to view Wilson than as described in the report; therefore, his testimony enhanced his credibility.

approach is reported, a description of the facial features of two of them.  If Pierce had not seen their faces, he could not have described their facial features in the manner reflected in the report.[16]  In addition, it contains a section entitled "Suspects Actions Before Offense", in which boxes are checked, for both "wanted subject" no. 1 and no. 2, for "loiters in area", "walks up to victim", "approaches from behind", and "follows victim on foot".

The other discrepancies found to be material by the district court concern the identity of the perpetrator who struck Pierce in the face, pushed him down, and took his money.  The report, quoted *supra*, states that "the first unk NM, with knife struck L. Pierce in face and struggle [e]nsued"; that Pierce was forced to the ground by "NM #1", who jabbed Pierce in the lower back and buttock, telling him to stay on the ground and give up the money; and that "Wanted Subject #1" then "went into" Pierce's back pocket, removing

_____

[16]    The report contains the following description of the first subject:  name, "UNK"; race, "N"; sex, "M"; date of birth, "APX 20"; height, "5'7""; and weight, "120".  For "Wanted Subject" no. 1, boxes are checked for black hair in a short "Afro" style, a goatee and mustache, black complexion, round face, brown eyes, a small nose, good teeth, and a dirty appearance.  The section entitled "Additional Description/Clothing - Tattoos - Scars and Teeth", contains the following:  "Eyes squinted, cut off blue jeans with T-Shirt, sneakers w/o socks, in possession 4" folding buck knife".

The second subject is described as:  name, "UNK"; race, "N"; sex, "M"; date of birth, "APX 20"; height, "5'7""; and weight, "150".  For "Wanted Subject" no. 2, boxes are checked for long, black hair, heavy stocky build, brown complexion, long facial shape, brown eyes, large nose, good teeth, and dirty appearance.  A box is also checked under the section for "Facial Hair", but this portion of the report is illegible, and it is unclear whether "neat" or "unshaven" was checked.  In the space for additional description, the second subject is described as wearing "light blue shirt, cut off blue jeans, sneakers w/o socks".

his wallet, and taking a $5.00 bill.  At trial, Pierce testified that the perpetrator later identified as Wilson came up to him and tried to go through his pockets; that he hit Wilson and broke free, but then Wilson hit him, knocking his glasses off; that Wilson grabbed him from behind and wrestled him to the ground; that the "guy" with the knife placed the knife in his side; and then "they" went through his pockets and took his money.

The district court interpreted the report as using the terms "first unk NM", "NM #1", and "Wanted Subject #1" to refer to the same individual -- an assailant other than Wilson.  It therefore concluded that, according to the report, an assailant other than Wilson struck Pierce, wrestled him to the ground, and took his money -- a version that differed materially from Pierce's trial testimony that Wilson struck him and knocked his glasses off, grabbed him from behind and wrestled him to the ground, and that "they" took his money.

The district court's interpretation of the cryptic labels used in the report to describe the perpetrators is certainly plausible. (One wonders why the author of the report used, in three consecutive sentences, three different terms ("first unk NM", "NM #1", and "Wanted Subject #1") to describe, apparently, the same individual.)  In any event, considering the circumstances of the report's preparation, the fact that Pierce neither signed nor otherwise adopted the report, and the lack of any testimony about the report by either Pierce or its author, it is extremely difficult to evaluate the impact, if any, that disclosure of the report, and cross-examination of Pierce about the discrepancies

between it and his testimony on direct examination, would have had on the outcome of the trial.

As our court stated in **Lindsey v. King**, 769 F.2d 1034, 1043 (5th Cir. 1985), "[w]hether it is reasonably probable that a different result might have obtained had the evidence been disclosed [can be] a question of agonizing closeness".  In making the close call presented here, we must not focus solely on the discrepancies between Pierce's testimony and the report.  We must consider also items which are consistent: (1) the date, time, and location of the robbery, the number of assailants involved, and the amount of money taken from each of the victims are the same in both the report and Pierce's testimony; (2) Wilson fits the physical description of "wanted subject #2" in the report, and Pierce's description of Wilson at trial is consistent with the report's description of Wilson;[17] (3) Pierce's testimony that the third suspect stood watch during the robbery is consistent with the report; and (4) Pierce's testimony that Wilson held him while the other assailant stabbed him is consistent with the report, which states that Pierce noticed a small incision made by "wanted subject #1".  In addition, Pierce's testimony regarding the robbery is generally consistent with the version of the robbery testified to

---

[17]    On cross-examination at trial, when asked to state how he had described Wilson to the police on the day of the robbery, Pierce responded:  "somewhat big"; "[a]bout 5'7""; "a lot of hair, somewhat large"; a "bush" hair style, "[h]igher on the top than on the side"; wearing a short-sleeved, light blue shirt and cut-off blue jeans, and tennis shoes with no socks; a "rather large" nose with "somewhat acne on his face", eyes that were "somewhat closed", "a lot of flesh" on his head, and a "low" forehead; age "18 or 19", a complexion "in between" light and dark, and a "stout, muscular" (not "skinny") build.

by Bowie, the other victim.[18]

[18] As noted, Bowie could identify Wilson only by his build. At trial, Bowie described the robbery as follows:

> [W]e left school around 4:00 .... It was myself and Leonard Pierce. We took the route going past the pumping station ... and we had to go down A. P. Touro towards Florida Avenue .... We were going around the back of the pumping station ... when one dude came from around the back of the pumping station. At the same time he came out, another guy came from behind us with a knife and he put it in Mr. Pierce's back and the third man came across from the left and he blocked us from going ... to the left and the man from behind the pumping station was blocking us from the right. So, they put the knife in Leonard's back and ... he was asking Leonard for his money and he hit him and they wrestled to the ground and while they were doing that, the man with the knife came to me and asked me for my money and I gave him $6 and he went back to the guy that was wrestling with Leonard. The one with the knife gave the knife to the man that was holding Leonard and they proceeded to go through his pockets and take the money out of his pockets and after that, they just ran, they left because a car was coming.

Bowie testified that he was walking on Pierce's right side, and that "the man that wrestled Leonard [Pierce] down, he cut across the left of both of us and ... that is where he came up at. Leonard was the closest one. That is why he grabbed Leonard and wrestled him to the ground". On cross-examination, defense counsel asked Bowie what he saw Wilson doing during the robbery, and Bowie responded:

> [H]e came up to Leonard ... and he hit Leonard. He punched him in the jaw .... [H]e knocked off Leonard's glasses and broke his glasses. After he punched him, he ... wrestled him to the ground .... [W]hile he was wrestling Leonard to the ground, the man with the knife came to me and took my money. He went back over to help the other guys rob Leonard. The man with the knife gave the knife to the guy [Wilson] that was holding Leonard.

Bowie testified that Wilson "held the knife in Leonard's back and the one that first had the knife proceeded to go through his pockets and take his money"; and that Wilson was wearing a light blue shirt and cut-off blue jeans, and white tennis shoes without socks.

Finally, Wilson did not present a strong case for mistaken identity. Although 12 alibi witnesses testified that, at the time of the robbery, Wilson was playing football some distance away, we agree with the state appellate court's characterization of their testimony as "less than definite". *State v. Wilson*, 463 So. 2d at 657. As that court noted, those witnesses "had no reason to fix events of the day of the robbery in their minds until weeks thereafter when [Wilson] was charged or, in most cases, until five or six months later when [Wilson's] mother sought them out as witnesses". *Id*. at 656.[19]

Because the report's description of the robbery is subject to an interpretation that is less incriminating than that presented by Pierce's testimony, the State should have disclosed it. But, although the conduct of the trial might have been affected by the failure to do so, we cannot conclude that there is a reasonable probability that, had it been disclosed, the outcome of the trial would have been different. Considering the inculpatory, not exculpatory, nature of the version in the report, the report's consistency with much of Pierce's testimony, Pierce's opportunity to see Wilson during the robbery and his very definite identification of Wilson at trial, the consistency of Pierce's and

---

[19] On direct appeal, Wilson contended that the evidence was insufficient because a rational trier of fact could not disbelieve the testimony of his 12 alibi witnesses. *State v. Wilson*, 463 So. 2d at 656. He also contended that the state appellate court should consider the polygraph evidence (indicating that he and one of his witnesses told the truth at trial) which he introduced at the hearing on his motion for a new trial. *Id.* at 657. In an extremely thorough and well-reasoned opinion, the state appellate court rejected those contentions. *Id.*

Bowie's testimony, and the less than definite testimony of Wilson's alibi witnesses, we cannot say that our confidence in the outcome of the trial has been undermined by the State's failure to disclose the report.[20]

## III.

At bottom, the *Brady* rule is one of the methods for seeking to ensure due process -- a fair trial. Wilson received that. Accordingly, we **REVERSE** the judgment of the district court and

---

[20]    For example, the discrepancies at issue are far less compelling than those in an eyewitness's undisclosed statement and trial testimony in *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985). Lindsey's capital murder conviction and death sentence rested on the testimony of two identifying eyewitnesses. The prosecution did not disclose an earlier statement by one of them that he did not see the perpetrator's face. Although the other eyewitness' identification testimony was positive, our court concluded that, in light of the poor circumstances for identification and the presence at the scene of the defendant's companion, who "bore a striking resemblance" to the defendant, the undisclosed statement was material. *Id*. at 1042-43. The materiality evaluation also seems to have been influenced by the fact that *Lindsey* was a capital case and there was "a real possibility that the wrong man is to be executed". *Id*. at 1043.

As another example, the discrepancies at issue are also less significant than those in *Monroe v. Blackburn*, 607 F.2d 148 (5th Cir. 1979), *cert. denied*, 446 U.S. 957 (1980), in which the crucial evidence of guilt was the defendant's fingerprint taken from the door handle of the robbery victim's truck. *Id*. at 150, 152. At trial, the victim, who admitted on cross-examination that he did not get a good look at the robber and was not able to positively identify the defendant as such, testified that he heard a noise on the door of his truck immediately before the robbery. *Id*. But, in his statement to the police two hours after the robbery, the victim did not mention hearing the noise. *Id*. The defendant contended that the victim's testimony about the noise was relied on by the prosecutor to establish that his fingerprint was placed on the door at the time of the robbery rather than at some other time. Our court agreed, holding that the victim's statement to the police "is impeachment evidence of the sort that goes directly to a substantive issue and could be used in urging that the in-court testimony has been `improved' by the erroneous addition of what the prosecution needed to support its theory". *Id*. at 152.

**REMAND** for consideration of Wilson's Sixth Amendment claim.

**REVERSED AND REMANDED**

WALTER, District Judge dissenting:

I respectfully dissent.  I agree with the majority that "the determinative question is whether the report was 'material'; [that] is, whether 'there is a reasonable probability that, had the report been disclosed to Wilson, the result of the jury trial would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  However, I disagree with the majority that a police report, sworn or unsworn, adopted or not, is not "material" where it directly calls into question the accuracy and the credibility of the testimony given by the State's sole witness able to positively identify Wilson as one of the robbers.[21]

The majority recognizes that other than the testimony of the other victim, who identified Wilson only by his build, "there was no other corroborating evidence of Wilson's guilt...[t]hus, Pierces' eyewitness testimony was essential to Wilson's conviction...[and] our focus is on whether the report contains information that could have been used on cross examination, to significantly undermine Pierces' credibility." (majority opinion p. 14)  The police report contained the only evidence capable of providing the defense with an opportunity to undermine Pierce's credibility.  His testimony was enhanced by a sworn version of the robbery that allowed him a greater opportunity to view the robbers than the account described in the report.  Pierce's credibility was

---

[21]The majority bases its decision on the following:  the police report was unsigned and unacknowledged by Pierce, the police report contained many similarities to the trial testimony and the other victim gave a similar account and "identified" Wilson by his build.  The majority states that "the report does implicate Wilson...it implicates him as one of the three perpetrators of the armed robbery, each of them aided and abetted the others." Footnote 5.  I disagree.  The police report merely gives a general description of three armed robbers and the victim's account of the events as they unfolded.  It does not identify Wilson in particular as one of the perpetrators.

further buttressed by testimony that he was "absolutely sure" and had "no doubt" that Wilson was the person who robbed him. Pierce testified that Wilson was "face to face...less than a foot away from my face." The police report is clearly material to the defense because it provides evidence that contradicts Pierce's trial testimony regarding his opportunity to view his attackers. Without the ability to use, or even know of, the inconsistent police report of the investigating officer, the testimony provided by the State's sole identifying witness was all but impregnable. Wilson was deprived of his right to a fair trial. *See Giglio v United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (defendant's fundamental rights of due process were violated by non-disclosure of evidence that impeached the reliability and credibility of a key witness where potentially impeaching evidence was never presented to the jury for consideration) *See also United States v Oxman*, 740 F.2d 1298, 1313 (3rd Cir. 1984) (when impeaching evidence that significantly impairs the incriminatory quality of a witness' testimony is not disclosed to the defense, a new trial must be granted because the impeachment of an incriminating witness with significant evidence attacking the truthfulness of his testimony "might affect" the jury's assessment of reasonable doubt and thereby affect the outcome of the trial).

Considering that the police report was Brady evidence, that it was wrongfully withheld by the prosecution, and that it contained a substantially different account of the robbery than that presented in open court, had the evidence been disclosed to the defense and been used effectively, the result of the proceeding

would probably have been different.   I respectfully dissent.